**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: 6-29-18

------------------------------------------------------------------ x

JACQUELINE CADDICK,

                        **Plaintiff,**

       -against-

PERSONNEL CO I LLC, ET AL.

                     **Defendants.**

------------------------------------------------------------------ x

16-CV-7326 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., District Judge:**

Plaintiff Jacqueline Caddick ("Plaintiff" or "Caddick") brings this *pro se* action for monetary damages against defendants Gail Golden Icahn ("Ms. Icahn"), the wife of investor and businessman Carl Icahn ("Mr. Icahn"), and Personnel Co. I LLC ("Personnel"), a company that employs the Icahns' household staff (collectively, the "Defendants"). This is primarily a discrimination suit arising out of Caddick's previous employment as a housekeeper for the Icahns. Plaintiff's Second Amended Complaint alleges national origin and gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Humans Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), retaliation claims under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), and common-law defamation. This Opinion resolves Defendants' Motion to Dismiss.

Caddick has failed to exhaust her administrative remedies with respect to her Title VII claims. In addition, because Plaintiff has failed to adequately allege participation in a protected activity known to defendant, as well as a causal connection between that activity and her termination, she fails to state a claim for FLSA retaliation. The Court declines to exercise

**COPIES MAILED**

jurisdiction over Plaintiff's remaining state law claims. Thus, for these reasons, and as set forth in greater detail below, the Motion to Dismiss is GRANTED.

BACKGROUND

## I. Factual Background

The allegations in the Second Amended Complaint ("SAC") are assumed true only for purposes of the Motion to Dismiss.

Plaintiff is a 53-year-old woman, born in England. SAC ¶ 6. She is a dual citizen of the United States and the United Kingdom. From 1991 to 2005, Plaintiff worked in New York in the fashion industry before returning to the United Kingdom to care for her mother. SAC ¶¶ 20-21. In 2010, Plaintiff moved to New York and signed up with an employment agency called Pavilion Agency. SAC ¶ 23. Plaintiff's agent, Rosalie Aguilar ("Aguilar"), found a position for Plaintiff as a part-time personal assistant and house manager for a wealthy family in Brooklyn, and she worked there from 2011 to early 2015. SAC ¶¶ 23, 25.

In January 2015, Aguilar informed Plaintiff of an opening for a full-time house manager position for Mr. and Ms. Icahn, with whom Aguilar had previously worked. SAC ¶¶ 24, 26. On or about January 6, 2015, Plaintiff visited the Icahns' primary residence on 53rd Street for an interview with Jennifer Liscomb ("Liscomb"), the current house manager. SAC ¶¶ 11, 27. Liscomb told Plaintiff that the position was for the morning shift, but that Plaintiff may have to work overtime shifts. SAC ¶ 29. After the interview, Liscomb gave Ms. Icahn her approval, to which Ms. Icahn responded that Mr. Icahn would "love [Plaintiff] because she's English." SAC ¶ 31.

Plaintiff then attended an interview with Ms. Icahn. SAC ¶ 32. Ms. Icahn asked Plaintiff whether she could drive or cook, to which Plaintiff said that she could. SAC ¶ 34. After Ms. Icahn

warned Plaintiff that Mr. Icahn could be "very difficult, and has people crying all the time," Plaintiff asked to meet Mr. Icahn. SAC ¶¶ 35-36. As they awaited Mr. Icahn's arrival, Ms. Icahn told Plaintiff that Mr. Icahn was "lucky" because Mr. Icahn had "a special thing about English people[.]" SAC ¶ 37. Plaintiff and Mr. Icahn met for approximately ten minutes during which Icahn asked about her English background. SAC ¶ 38.

Plaintiff commenced employment with the Icahns on a two-week, part-time trial basis. SAC ¶ 41. On January 23, 2015, Plaintiff signed an offer letter from the Icahns, agreeing to an annual salary of $95,000 with overtime pay of $68.52 per hour over 40 hours per week. SAC ¶¶ 42-44. On February 1, 2015, she commenced full-time employment, and received a list of duties including cooking breakfast for the Icahns, ordering and stocking food, and maintaining the kitchen and laundry. SAC ¶¶ 45-46.

In early February, Plaintiff drove Mr. Icahn to the Icahn offices and insisted that he wear a seatbelt. SAC ¶ 47. The next day at breakfast, Ms. Icahn said to Plaintiff in a nasty tone that she had "heard that you got [Mr. Icahn] to wear the seat belt, because you told him that the English have to wear them." SAC ¶ 48. Plaintiff responded that it had nothing to do with being English, but for his own safety. SAC ¶ 49.

During the second week of February, Ms. Icahn asked Plaintiff to drive her to her daughter's apartment. SAC ¶ 50. When they arrived at her daughter's apartment, Plaintiff told Ms. Icahn, "I will pop the boot and take the luggage into the lobby for you," to which Icahn replied, "Pop the what? In America, it's called the trunk." SAC ¶¶ 51-52.

In the middle of February, Plaintiff was in the kitchen with Ms. Icahn's personal assistant, Leslie Lane ("Lane"), when Ms. Icahn entered the kitchen complaining that Mr. Icahn's bed had not been made properly, pointing at Plaintiff. SAC ¶¶ 54-55. Plaintiff pointed out that this was

Lane's responsibility, to which Icahn responded: "[s]uck it up, you need to pay your rent." SAC ¶ 57. Icahn later told Plaintiff that making the bed was now her responsibility. SAC ¶ 58.

Around the end of February, Ms. Icahn asked Plaintiff to drive her to the Upper East Side. SAC ¶ 59. When Plaintiff got in the car, she spend a minute familiarizing herself with the car, causing Icahn to yell, "What the fuck are you doing, just drive." SAC ¶ 60. Icahn proceeded to complain about Plaintiff's slow driving, and, when Plaintiff asked for assistance with directions, Icahn told her to "[r]ead the fucking signs and make the light." SAC ¶¶ 62-63. When Plaintiff accelerated to make the light, Icahn complained, "[y]ou're going too fast." SAC ¶ 64. After Icahn told Plaintiff to "tailgate" the car in front and Plaintiff asked what that meant, Icahn said, "[y]ou need to learn how to drive this fucking car." SAC ¶¶ 65-66.

Around the end of March, when Plaintiff told Ms. Icahn that she would check to see if the chef had prepared a "pan of soup" for dinner, Icahn replied, "[i]t's a pot, not a pan. You and your stupid accent." SAC ¶¶ 67-68. Another time, when Plaintiff was dropping Ms. Icahn off, Icahn told her to not "tell Mr. Icahn you dropped me off here." SAC ¶ 69. Plaintiff responded that she did not want to lie to Mr. Icahn, to which Icahn replied that she "will do as you're told, fucking think of something." SAC ¶¶ 70-71.

In another incident, also around the same time, Ms. Icahn had asked Plaintiff to cook dinner for her guests, and asked her what she was good at cooking. SAC ¶ 72. After Plaintiff told Icahn that she only had difficulty cooking fish, Icahn told her to make fish. SAC ¶¶ 73-74. The next day, Icahn told Plaintiff, "English people are not known for cooking but apparently your food is better than a trained chef's. So from now on, you're going to be doing a lot more cooking." SAC ¶ 75.

At some point, Karen Bush ("Bush") was appointed as Ms. Icahn's personal assistant, and assumed the role of Plaintiff's supervisor. SAC ¶¶ 76-77. On or about June 10, 2015, Bush told Plaintiff that she had to sleep over at the 53rd Street residence to care for Mr. Icahn. SAC ¶ 78. Plaintiff told Bush that she did not want to stay over, and that, if anything were to happen to Mr. Icahn, she was not a trained nurse. SAC ¶ 79. Bush relayed this conversation to Ms. Icahn, and Ms. Icahn responded that Plaintiff would "do it like everyone else." SAC ¶¶ 80-81. Plaintiff asked Bush whether she would receive overtime pay, to which Bush responded that she would not, as "nobody else gets it." SAC ¶¶ 82-83. Plaintiff complained to Bush that she would have to work three shifts in a row, which no one else had to do. SAC ¶ 84. Bush did not respond. SAC ¶ 85. Plaintiff slept over that evening, and was not paid for the overtime she worked until October 23, 2015, after her employment had been terminated. SAC ¶ 87.

On or around June 11, 2015, Ms. Icahn went to the Hamptons for the summer. SAC ¶ 88. While she was there, she did not communicate directly with Plaintiff, but only through Bush. SAC ¶ 89. In July, Bush told Plaintiff that she had to stay overnight again, to which Plaintiff refused, citing the failure to pay overtime. SAC ¶¶ 90-91. Bush told Plaintiff she was being insubordinate and would "call HR." SAC ¶ 92. Bush called Loren Miller ("Miller") of Personnel, who told Bush that Plaintiff was not to do anything that was not part of her job description. SAC ¶¶ 94-95. Bush informed Ms. Icahn that Miller told her that Plaintiff was not to sleep over, to which Icahn became infuriated, yelling at Bush, "Who the fuck told you to go over my head and go to human resources, I am in charge of the house, not you." SAC ¶¶ 96-97.

Plaintiff was scheduled to take two weeks' leave in August 2015. SAC ¶ 99. Though Ms. Icahn had approved the leave, Bush told Plaintiff that when Bush reminded Ms. Icahn about the

leave, she "went ballistic[,]" stating that if she had her way, Plaintiff would never get vacation. SAC ¶¶ 99-101. Bush told Plaintiff that Ms. Icahn "really ha[d] it in for [Plaintiff]." SAC ¶ 101.

Ms. Icahn had also told Plaintiff that she would be responsible for supervising construction at the 53rd Street residence while the Icahn family was in the Hamptons. SAC ¶ 102. On or about August 24, after Plaintiff had returned from her vacation, Plaintiff called Bush and asked when the cleaning team would be coming following the completion of the construction work. SAC ¶ 104. Bush told Plaintiff that Icahn indicated that because Plaintiff was "lazy and ha[d] nothing to do," she would have to clean the entire apartment alone. SAC ¶ 105. When Plaintiff told Bush that this was not physically possible, Bush agreed, indicated that it would take five people to clean the apartment on a regular week without the mess of construction. SAC ¶¶ 106-07. Ms. Icahn nonetheless required Plaintiff to clean the residence alone. SAC ¶ 108. On September 7, 2015, Plaintiff found that some items in the residence were broken or missing and reported this to Bush. SAC ¶ 109.

On or around September 9, 2015, Ms. Icahn returned from the Hamptons and began "harass[ing]" Plaintiff for complaining about being required to work overtime without pay. SAC ¶¶ 110-12. On September 9, 2015, Ms. Icahn criticized Plaintiff for coming to work early and for working late. SAC ¶¶ 113(a)-(b). On September 11, 2015, Ms. Icahn complained to Plaintiff that her "service last night was terrible, and the table setting was ugly and the napkins were hideous." SAC ¶ 113(c). She warned Plaintiff that she "better start to do a better job." *Id.* The same day, Ms. Icahn criticized Plaintiff for the way her bathroom had been cleaned–even though it was not Plaintiff's responsibility–saying: "[m]y bathroom is filthy, you didn't clean my bathroom properly." SAC ¶ 113(d). Icahn also accused Plaintiff of being a liar, saying to her: "You're

always lying and trying to blame other people because you don't do your job properly. When I told you to clean my jewelry with ammonia, you did what you wanted." SAC ¶ 113(e).

On September 15, 2015, Ms. Icahn accused Plaintiff of being responsible for a missing 22 carat diamond ring that Ms. Icahn had placed in a shopping bag. SAC ¶ 114. She called Plaintiff an "idiot," told her that she was "in big trouble," and threatened to call the police commissioner. *Id.* Icahn later located her ring in a safe at the 53rd Street residence. SAC ¶ 115. On September 16, 2015, Ms. Icahn again criticized Plaintiff for being early, and for items that had been broken or gone missing during construction, saying: "You, you're a fucking idiot, you never do as you're told and you're always trying to blame others when you don't do your job. Because of you there are things missing and broken." SAC ¶ 116.

On September 18, 2015, Ms. Icahn criticized Plaintiff for being late, even though she was early. SAC ¶ 117. Later that day, Ms. Icahn told Plaintiff that, "I have spoken with Mr. Icahn and Carl has decided you are overqualified for the job, and therefore highly unsuitable." SAC ¶ 118. She gave Plaintiff a separation letter and told her that she would give her a severance payment and a "great reference." SAC ¶ 123. She told Plaintiff that she "already called Pavilion and spoke to them. I told them you are so talented you would be able to run a household all by yourself, so you won't have a problem finding a job quickly." SAC ¶ 124. That day, Plaintiff spoke to Aguilar, who told Plaintiff that there was a job for Plaintiff and she would send along her resume. SAC ¶ 125. However, Aguilar never contacted Plaintiff about that job, and, from September 19, 2015, to December 2015, Pavilion did not contact Plaintiff about job opportunities (despite posting many applicable opportunities on their website). SAC ¶¶ 126-28.

In December 2015, Aguilar called Plaintiff and told her that the available jobs did not pay enough for her, and that Pavilion was waiting for something special for her. SAC ¶ 130. Since

then, Aguilar has only sent Plaintiff to two interviews.  SAC ¶ 131.   One of those interviews was successful, but Pavilion ultimately opted to place another individual at that position.  SAC ¶ 132. Plaintiff claims that Ms. Icahn made negative statements about Plaintiff to Pavilion and told Pavilion not to help Plaintiff obtain a new job, thus rendering her unable to find work.  SAC ¶¶ 133-35.

## II.    Procedural History

On October 22, 2015, Plaintiff filed charges of discrimination with the New York State Division of Human Rights ("NYSDHR") and Equal Employment Opportunity Commission ("EEOC") regarding her treatment and termination (the "Charge").  SAC ¶ 129; *see* Declaration of Eli Freedberg ("Freedberg Decl."), Ex. A.[1]   However, because the Charge did not allege that she was a member of any protected class, that she participated in any activity protected by the NYSHRL, or that she suffered any adverse employment action because of her gender or national origin, the NYSDHR dismissed her claim for lack of jurisdiction on April 6, 2016.  Freedberg Decl., Ex. B.  The EEOC adopted the NYSDHR's findings and issued a Dismissal and Notice of Rights on June 26, 2016.  Freedberg Decl., Ex. C.

On September 20, 2016, Plaintiff filed this action *pro se* against Personnel.  *See* Complaint (ECF No. 2).  After the Court ordered that Plaintiff amend her complaint to adequately state claims for gender and national origin discrimination, Plaintiff filed an amended complaint on December 14, 2016.  *See* Amended Complaint (ECF No. 5).  After Personnel sought to file a motion to dismiss

---

[1] In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a district court may not typically consider extrinsic materials except where they are attached to the complaint, incorporated by reference, or so heavily relied upon by the complaint that they are integral to the complaint.  *E.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted).  While a court may take judicial notice of certain administrative records, it must be clear on the face of the documents "that they are part of the administrative record." *Joglo Realties, Inc. v. Seggos*, 229 F. Supp. 3d 146, 150 n.3 (E.D.N.Y. 2017) (quoting *Sahni v. Staff Attorneys Ass'n.*, No. 14-CV-9873 (NSR), 2016 WL 1241524, at *6 (S.D.N.Y. Mar. 23, 2016)).  Thus, the Court will consider Plaintiff's administrative charge, dismissal by the NYSDHR, and her EEOC Dismissal and Notice of Rights, as they are incorporated by reference or integral to the complaint, if not clearly part of the administrative record.  *See* SAC at 6, ¶ 129.

the Amended Complaint because Plaintiff failed to state a claim and because the Amended Complaint contained allegations outside of the scope of the Charge (*see* Pre-Motion Letter (ECF No. 17)), Plaintiff amended her complaint on July 21, 2017, adding Ms. Icahn as a defendant, and asserting the following claims: (1) national origin discrimination claims under Title VII, NYSHRL, and NYCHRL; (2) gender discrimination claims under Title VII, NYSHRL, and NYCHRL;[2] (3) FLSA and NYLL retaliation claims; and (4) defamation claims. *See* SAC (ECF No. 27).

Specifically, Plaintiff claims that Ms. Icahn's statement that she was overqualified was pretextual, given that Icahn was aware of Plaintiff's qualifications at the time Plaintiff was hired. SAC ¶ 119; *see* SAC ¶ 33 (indicating Ms. Icahn had Plaintiff's resume during interview). Plaintiff further alleges that her termination was in retaliation for her complaining about her overtime, or, alternatively, on the basis of her national origin or gender. SAC ¶¶ 120-22. As evidence of national origin discrimination, Plaintiff cites to a number of Ms. Icahn's remarks regarding her English origin, *e.g.*, SAC ¶¶ 48, 52. And, as evidence of gender discrimination, Plaintiff cites to, among other things, a New York Post article discussing Ms. Icahn's tendency to terminate female employees that are "younger" and "tech-savvy". SAC at 21.

On September 20, 2017, the Court granted Defendants leave to file a motion to dismiss Plaintiff's Second Amended Complaint and set a briefing schedule. *See* Order (ECF No. 32). The motion was fully briefed as of December 13, 2017, and this decision now follows.[3]

---

[2] Plaintiff's Second Amended Complaint does not formally allege a hostile work environment claim pursuant to Title VII. *See* SAC ¶ 137. Nonetheless, the analysis that follows assumes that Plaintiff intended to allege such a claim.

[3] On December 21, 2017, the NYSDHR reopened its investigation, and, on December 27, 2017, issued a finding, after further investigation, of no probable cause. *See* Defendants' 1/5/18 Letter, Ex B (ECF No. 48-2). Defendants argue– and Plaintiff does not contest–that this finding on the merits bars Plaintiff's state and city claims of discrimination under the election of remedies doctrine. *Compare* Defendants' Supplemental Brief (ECF No. 61) (arguing that sole remedy for claims pursued administratively, under city and state human rights laws, is now through petition for review in state supreme court), *with* Plaintiff's Supplemental Brief (ECF No. 62) (conceding that city and state human rights law claims must now be pursued in state court, but arguing that federal claims, as well as state defamation and labor

## STANDARD OF REVIEW

To survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading "need not include detailed factual allegations, but must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 F. App'x 70, 71 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). Recital of the elements of a cause of action, "supported by mere conclusory statements," is insufficient to show plausibility. *Id.* at 72. And yet "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted) (internal quotations omitted). Indeed, "the pleadings of a *pro se* plaintiff ... should be interpreted to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotations omitted).

## DISCUSSION

### I.     Exhaustion

Defendants seek dismissal of Plaintiff's Title VII claims for failure to exhaust her administrative remedies before the EEOC. Plaintiff argues that the allegations of discrimination and hostile work environment in her Second Amended Complaint are reasonably related to the allegations in her administrative charge. Alternatively, she contends that the NYSDHR

---

law claims may proceed). Although this would be valid basis for dismissal of these claims, *see York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002) (discussing election of remedies doctrine) (citing *Moodie v. Federal Reserve Bank*, 58 F.3d 879, 882 (2d Cir. 1995)), for the reasons set forth below, the Court declines to exercise jurisdiction over Plaintiff's state and city claims as a whole, and thus need not formally address the election of remedies argument.

representative who assisted her in drafting her administrative charge erred in failing to include the full extent of her charges.  Both arguments are unavailing.

"Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII ... statutory scheme[ ] and, as such, a precondition to bringing such claims in federal court." *Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir. 2000).  Prior to bringing an action pursuant to Title VII, a plaintiff is required to file a charge setting forth her claims with the EEOC within 300 days of the alleged acts of which she complains. *See Williams v. N.Y.C. Housing Authority*, 458 F.3d 67, 70 (2d Cir. 2006).  "Claims not raised in an EEOC complaint ... may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." *Williams*, 458 F.3d at 70.  "There are three types of reasonably related claims: (1) claims that fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; (2) claims that allege retaliation arising from the filing of an EEOC charge; and (3) claims that allege further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Roff v. Low Surgical & Med. Supply, Inc.*, No. CV033655 (SJF) (JMA), 2004 WL 5544995, at *2 (E.D.N.Y. May 11, 2004) (quoting *Butts v. City of N.Y. Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397, 1402–1403 (2d Cir. 1993)) (internal quotation marks omitted).  It is beyond dispute that only the first category of claims is at issue here.

"[T]he burden of pleading and proving Title VII exhaustion lies with defendant and operates as an affirmative defense." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018).  When such an argument is asserted at the motion to dismiss stage, non-exhaustion must be clear from the face of the complaint (and incorporated documents). *Jordan v. Forfeiture*

*Support Assocs.*, 928 F. Supp.3d 588, 594 n.5 (E.D.N.Y. 2013) (citing, *inter alia*, *McCoy v. Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003)).

A court evaluating a claim of non-exhaustion must consider whether "the factual allegations made in the administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action." *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008). Thus, the focus should be on the factual allegations in the administrative complaint, rather than what formal labels are attributed to such allegations, or what boxes are checked. *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003).

In Plaintiff's Second Amended Complaint, she has asserted that she was discriminated against on the basis of her gender and national origin and subject to a hostile work environment. SAC ¶¶ 137, 140-41. However, Plaintiff did not assert such claims in her EEOC charge. *See* Freedberg Decl., Ex. A. Rather, her charge is based exclusively upon having been *retaliated* against for opposing discrimination, a different charge than discrimination itself. *Roff*, 2004 WL 5544995, at *3. In regards to her retaliation claim, the charge then goes on to describe the two instances of her refusing to stay overnight and attend to Mr. Icahn, which she claims caused Ms. Icahn to speak to her in a demeaning manner with foul language. Freedberg Decl., Ex. A. Then, the charge summarizes the September 14, 2015 incident when Ms. Icahn mistakenly accused Plaintiff of being responsible for her missing jewelry, which she claims resulted in her "being terminated." *Id.*

At no point, however, does Plaintiff describe the discriminatory conduct purportedly underlying the retaliation. Rather, the alleged retaliatory acts appear to arise predominantly from Plaintiff's complaints regarding having to work overtime and the jewelry incident, not from any complaints she made regarding national origin or gender discrimination. However, even had

plaintiff properly alleged retaliation for complaining of discrimination, she would also be required to separately exhaust a claim for the underlying discrimination (which she has not done). *Roff*, 2004 WL 5544995, at *3.

As such, even drawing all reasonable inferences in favor of Plaintiff as required at this stage, Defendants have amply demonstrated Plaintiff's failure to exhaust her administrative remedies before the EEOC. Holding otherwise would frustrate the purpose of the notice provision, which is to encourage settlement by allowing administrative agencies "the opportunity to 'investigate, mediate, and take remedial action . . .'" *Dukes v. Steinman, Boynton, Gronquist & Birdsall*, No. 93-CV-7044 (RO), 1994 WL 406090, at *1 (S.D.N.Y. July 29, 1994) (quoting *Butts*, 990 F.2d at 1401-02). As the NYSDHR decisions make clear, without an allegation that Plaintiff was a member of a protected class, or that there was a nexus between an adverse employment action and protected class membership, such a claim was impossible to investigate. *See* Freedberg Decl. Ex. B (suggesting that basis of opposed discrimination/retaliation was not subject to anti-discrimination provisions of NYSHRL); *see also* NYSDHR 12/19/17 Memo. at 2 (ECF No. 48-2) (elaborating on the basis of this conclusion).

However, Plaintiff alternatively claims that the representative at NYSDHR who assisted her with drafting her charge failed to properly include all of her allegations, including gender and national origin discrimination. Plaintiff attaches numerous exhibits to her opposition brief, including multiple pages of handwritten notes which she claims were given to the representative for the purpose of drafting her complaint. However, even if these submissions could be properly considered at this stage,[4] they do not plausibly suggest that Plaintiff was attempting to submit a

---

[4] As discussed above, for documents asserted to be part of the administrative record, it must be clear on their face "that they are part of the administrative record." *Seggos*, 229 F. Supp. 3d at 150 n.3 (quoting *Sahni*, 2016 WL 1241524, at *6). Here, the notes which Plaintiff has provided, which she–and not a NYSDHR investigator–drafted (by her own admission), are neither dated nor stamped by the NYSDHR. Thus, it is not clear that they were part of the

charge of discrimination at the administrative stage. *See Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (suggesting that Plaintiff's rebuttal of Defendant's establishment of affirmative defense must meet "the usual burden of a motion to dismiss, which is to say they must plead sufficient facts to plausibly suggest that they are entitled to relief") (citing *Iqbal*, 556 U.S. at 678).

"When allegations are excluded from a charge of discrimination due to agency error, a court may find those allegations properly exhausted despite the fact that they were not included in the charge." *Winston v. Mayfair Care Ctr., Inc.*, No. 09-CV-4792 (ARR) (LB), 2011 WL 10045251, at *9 (E.D.N.Y. Mar. 4, 2011) (citing, *inter alia*, *Deravin*, 335 F.3d at 203). Courts have thus considered documents such as intake questionnaires for the purposes of assessing a plaintiff's claim of administrative error to account for a failure to exhaust. *Id.* (surveying cases).

Here, Plaintiff's submissions do not establish that she has exhausted her administrative remedies because they do not allege that Defendants mistreated Plaintiff or based any adverse employment action on her gender or national origin. Indeed, as Plaintiff's own opposition brief betrays, the bulk of her newly-submitted materials only serve to bolster the conclusion that her administrative claim was focused exclusively upon retaliation for her complaints about overtime, rather than discrimination. *See* Plaintiff's Memorandum of Law in Opposition of Defendants' Motion to Dismiss ("Pl's Mem.") at 4-7 (ECF No. 42) (arguing that supplemental materials establish Plaintiff was complaining about discrimination to NYSDHR, but failing to cite to a single example of allegation that Plaintiff was member of protected class, or discriminatory animus); *see also* Pl's Mem. Exs. A-I (pages of notes and correspondence describing the same incidents reflected in Plaintiff's charge, including incidents involving harassment and foul language, with only a few vague and passing references to "discrimination"). Thus, unlike the above-cited cases

---

administrative record, and the Court may not technically consider them. However, the Court proceeds to consider them for the sake of argument and for the purposes of assessing whether leave to amend the complaint would be futile.

that have considered other materials to excuse a failure to exhaust, where some evidence has verified Plaintiff's claim to administrative error, here, Plaintiff's own documentation does not even substantiate her claim of having asserted discrimination to the NYSDHR investigator, but instead substantially mirrors the notice of charge that the NYSDHR investigator ultimately drafted. *See, e.g., Deravin*, 335 F.3d at 203 (noting that discrepancy between initial administrative complaint and EEOC notice of charge "verifie[d] Deravin's claim of administrative error" and would require court to make credibility determination inappropriate for Rule 12 stage).

Accordingly, the Court must dismiss any gender or national origin discrimination claim Plaintiff asserts in this action, and need not reach Defendants' alternative arguments.[5]

## II.    FLSA Claim

With Plaintiff's Title VII claims dismissed, the only remaining federal claim is her FLSA cause of action. However, Plaintiff fails to allege a sufficient causal nexus to support a FLSA retaliation claim.

The anti-retaliation provision of the FLSA provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). A complaint asserting an FLSA retaliation must allege facts demonstrating: "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit;

---

[5] The Court dismisses these claims with prejudice because leave to amend would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (suggesting that a *pro se* Plaintiff should be allowed leave to amend following a Federal Rule of Civil Procedure 12(b)(6) dismissal "when a liberal reading of the complaint gives any indication that a valid claim might be stated[,]" *i.e.*, where futility is not clear). Plaintiff can no longer amend her administrative charge. *See* 42 U.S.C. § 2000e-5(e)(1) (providing for a 300–day statute of limitations in a "case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... after the alleged unlawful practice occurred."). And, for the reasons addressed above, she has failed to present evidence that she might amend her complaint to successfully demonstrate agency error. Moreover, Plaintiff was put on notice of Defendants' exhaustion arguments well in advance of the filing of her Second Amended Complaint. *See* Pre-Motion Letter (ECF No. 17). Thus, the Court is satisfied that leave to re-plead–to the extent that Plaintiff even seeks to do so–would be futile.

15

(2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quoting *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)) (internal quotation marks omitted).

As to the causal connection element, Plaintiff may specifically allege a connection either "directly, by alleging facts of a retaliatory animus against him," or "indirectly, either by showing a temporal relationship in which the protected activity was followed closely in time by discriminatory treatment, or by other circumstantial evidence." *McManamon v. Shinseki*, No. 11-CV-7610 (PAE), 2013 WL 3466863, at *12 (S.D.N.Y. July 10, 2013). However, temporal proximity "must be very close" for the purposes of retaliation claim. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). "[C]ourts in this Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Straebler v. NBC Universal, Inc.*, No. 11-CV-4131 (DAB), 2013 WL 541524, at *8 (S.D.N.Y. Feb. 11, 2013) (quoting *Beachum v. AWISCO N.Y.*, 785 F. Supp. 2d 84, 98 (S.D.N.Y. 2011)).

Here, Plaintiff has failed to adequately demonstrate causation. Plaintiff alleges that she twice complained about not being paid for her overtime, on June 10 and again "around the 2nd week of July." SAC ¶¶ 79, 90-91; First Amended Complaint at 15 (ECF No. 5). Plaintiff was terminated on September 18, 2015. Nine or ten weeks is at the outer bounds of what is acceptable where, as here, a plaintiff relies solely on temporal proximity to demonstrate causation. Pl's Mem. at 7-9; *see Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half month gap too long to give rise to inference of causal connection); *Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962 (JFB) (AKT), 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19,

2007) (finding that the passage of two-and-a-half months between protected activity and adverse action was insufficient to establish a causal connection, and surveying cases suggesting line is drawn at two months); *Olorode v. Streamingedge, Inc.*, No. 11-CV-6934 (GBD) (AJP), 2014 WL 1689039, at *19 (S.D.N.Y. Apr. 29, 2014) (eleven weeks insufficient), *report and recommendation adopted*, No. 11-CV-6934 (GBD) (AJP), 2014 WL 3974581 (S.D.N.Y. Aug. 13, 2014).

Plaintiff's counterarguments that Ms. Icahn delayed in firing her because of her travel schedule is belied by her own pleadings, which describe how Ms. Icahn was still in close contact with her staff by telephone during her vacation and still making personnel decisions. SAC ¶¶ 81, 97. To be sure, Plaintiff does allege that, upon Ms. Icahn's return from her vacation in September, she received vague criticisms that appear to have been directed toward her complaints about the hours that she worked. *See* SAC ¶¶ 113(a)-(b).

But even were the Court to credit that allegation as sufficient to establish causation despite the significant temporal gap, Plaintiff's claim fails for the wholly separate reason that she has not adequately alleged participation in protected activity known to the defendant. For an oral complaint regarding overtime pay to satisfy this standard, it must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." *Dunn v. Sederakis*, 143 F. Supp. 3d 102, 111 (S.D.N.Y. 2015) (quoting *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 107 (2d Cir. 2015)). Some courts in this Circuit have suggested that, short of an express invocation of the FLSA, the oral complaint must be "framed in terms of potential illegality" in order to be considered protected activity. *Id.* (surveying cases). Others have applied a more lenient standard, suggesting that, at a minimum, the complaint must provide a "clear articulation of facts indicative of

17

illegality[,]" as opposed to "mere 'abstract grumblings[.]'" *Id.* (citing *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44 (1st Cir. 1999)).

Even applying the latter standard, Plaintiff's allegations do not pass muster. At the outset, there is there no allegation that Plaintiff invoked the FLSA or accused Defendants of illegality. Moreover, Plaintiff's June complaint mostly conveys concern over being less qualified than a nurse to work "overtime" to care for Mr. Icahn. Her general inquiry about whether she would receive "overtime pay" and why she had to work overtime shifts that others did not can hardly be distinguished from a complaint about Defendants' failure to follow internal policy or her contractual rights, rather than an illegality pursuant to the FLSA. SAC ¶ 82; *see Dunn*, 143 F. Supp. 3d at 113-14 (drawing similar distinction). Plaintiff's July complaint fares no better, as, again, it appears to have been directed solely toward internal policies, rather than an illegality. *See* SAC ¶ 91 (complaining that staying overnight, presumably to care for Mr. Icahn, was in Bush's job description, not Plaintiff's). As such, Plaintiff pleadings, even read in a light most favorably to her, do not suggest that a "finder of fact could . . . find . . . that her words were 'sufficiently clear and detailed . . . in light of both content *and context*' to convey that [Plaintiff] was asserting her legal rights under the FLSA." *Dunn*, 143 F. Supp. 3d at 114 (quoting *Greathouse*, 784 F.3d at 107) (emphasis added).

For these reasons, Plaintiff's FLSA claim is dismissed.[6]

### III.   Remaining State Law Claims

This Court's subject matter jurisdiction arises from federal question jurisdiction under 28 U.S.C. § 1331. *See* SAC at 3. Since this Court has dismissed Plaintiff's federal law claims, it

---

[6] Although Plaintiff has not sought leave to amend this cause of action, the Court would decline to grant such a request, as leave to re-plead would be futile, given the infirmities discussed above.

must next consider whether it is appropriate to exercise supplemental jurisdiction over the state and local law claims that remain.[7]

Under 28 U.S.C. § 1367(a), district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Claims "form a part of the same case or controversy" if they "derive from a common nucleus of operative fact." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004). Here, Plaintiff's state, city, and federal claims arise from a common nucleus of operative facts regarding Plaintiff's employment relationship with Defendants.

"The exercise of supplemental jurisdiction is left to the discretion of the district court." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004). A court balances "several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Id.* at 183 (quoting *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994)). When "all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Here, this Court has dismissed the federal claims well before trial. Accordingly, this Court exercises its discretion, in the interests of judicial economy, convenience, and fairness, to decline to exercise supplemental jurisdiction over Plaintiff's state and city law claims. *See, e.g.*, *Heard v. MTA Metro-N. Commuter R. Co.*, No. 02-CV-7565 (JGK), 2003 WL 22176008, at *5 (S.D.N.Y.

---

[7] Plaintiff alleges claims for discrimination and retaliation under state and city law, as well as claims for defamation and under N.Y. Labor Law § 215. *See* SAC at 4.

Sept. 22, 2003) (declining to exercise supplemental jurisdiction over state law claims after dismissing discrimination claims at motion to dismiss stage).

## CONCLUSION

For the aforementioned reasons, Defendants' Motion to Dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

In addition, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 445 (1962).

**SO ORDERED.**

Dated:      New York, New York
            June 29, 2018

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**